UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 2:85CR50(AVC) |
| | : | |
| v. | : | |
| | : | |
| AVELINO GONZALEZ-CLAUDIO | : | April 10, 2008 |

UNITED STATES OF AMERICA'S MOTION FOR DESIGNATION AS COMPLEX CASE
WARRANTING EXCLUDABLE TIME UNDER SPEEDY TRIAL STATUTE

The United States of America (the "United States") respectfully moves the Court for entry of

an Order pursuant to 18 U.S.C. § 3161(h)(8)(A), finding that this case is so unusual or so complex,

due to the nature of the prosecution and the existence of novel questions of fact or law, that it is

unreasonable to expect adequate preparation for pretrial proceedings or for trial itself within the time

limits ordinarily established by 18 U.S.C. § 3161, and therefore that excludable time is warranted

under the Speedy Trial Act.  Counsel for the defense has advised undersigned government counsel

that his client opposes this motion.  As grounds for this motion, the United States says the following.

### Contents

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Pertinent Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
A.    The Speedy Trial Act and Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
B.    Excludable Time and Detained Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
C.    Speedy Trial Rights as Applied to Fugitives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Summary

The above-captioned case warrants designation as an unusual or complex case under subsection (h)(8)(A) of the Speedy Trial Act, 18 U.S.C. § 3161, in that preparation for pretrial proceedings and for trial cannot reasonably be expected within the otherwise applicable 70-day deadline. Several categories of facts bring this matter within the ambit of an unusual and complex case designation. These fact categories include, respectively: (1) the complexity of the indictment and anticipated trial; (2) the extraordinary scope of investigative material from which the discovery and any trial evidence must be selected; and (3) the consequences of the 22 years of the defendant's knowing and willful fugitivity upon preparations for pretrial proceedings and trial.

First, the complexity of the indictment and anticipated trial are evidenced by the following facts:  the recently-arrested defendant is one of 19 individuals charged in a 17-count, 67-page superseding indictment returned 22 years ago, on March 21, 1986; the defendant is named in 15 of the 17 counts; the indictment alleges that the several defendants planned, perpetrated, and subsequently carried out numerous acts related to, an armed robbery of more than $7 million from a West Hartford Wells-Fargo depot; the defendants conducted the charged acts in their capacity as members of a revolutionary, Puerto Rico independence group known as the "Macheteros"; defendant Avelino Gonzalez-Claudio was one of the leaders of the Macheteros throughout the time frame of the charged conspiracy; the defendant participated in the cross-country transfer of, and later retained control over, a large portion of the robbery proceeds; and establishing the defendant's guilt will require proof of many facts concerning several co-conspirators' actions over a two-year period.

Second, the scope of investigative and other case-related materials from which discovery and trial evidence must be selected includes approximately 150 boxes of evidentiary materials held by the FBI; thousands of pages of FBI investigative reports; and approximately 300 boxes in the custody of the U.S. Attorney's office. Among other things, the boxes and reports are understood to contain: many thousands of documents, most in Spanish, from more than 40 court-authorized search warrants; extensive telephone toll records; several hundred hours of court-authorized Title-III interceptions, most or all in Spanish (translated in the 1980s; and stored on obsolete reel-to-reel tapes); numerous episodes of visual surveillance in multiple states, which generated a large quantity of information, photographs, videotapes, and reports; documents from such institutions as banks, car dealers, rental agencies, land records, motor vehicle departments, and United States and Mexican customs and border control. In preparing for the previous trials of certain co-defendants in this case – the last of which concluded 16 years ago – approximately 200 witnesses were identified and located. In addition to those materials and witnesses, there are several thousand pages of documents in hard copy and/or electronic storage format that were seized in a search at the time of the defendant's arrest in February of 2008, which will have to be translated and assessed for discovery and trial relevance.

Third, the consequences of the 22 years of delay between the 1986 return of the superseding indictment and the 2008 arrest of the defendant include, among other things:  the attrition from the New Haven and San Juan FBI and from the Connecticut U.S. Attorney's office of *all* the agents and prosecutors who had any extensive, hands-on familiarity with the evidence, witnesses, and legal issues pertinent to this prosecution; the consequent need for the newly-assigned FBI agents and prosecutors to re-create, from a point of virtually zero knowledge, the necessary familiarity with all those matters; the likelihood that many significant witnesses will be either deceased, difficult or

impossible to locate, or if found, lacking sufficient recall of the matters of which they once had knowledge; and the consequent need by the new investigative/prosecutive team to determine whether, and how, such evidentiary gaps can be filled for the present trial. That this delay is solely attributable to the defendant is evidenced by, among other things: (1) the fact that the FBI has been looking for the defendant throughout the years of his fugitivity; (2) the seizure of documents from the defendant's Puerto Rico residence upon his arrest in February 2008 that refer to his status as a federal fugitive; (3) the defendant's having lived for several years under a false identity; and (4) the seizure of several false identity documents from the defendant's residence at the time of his arrest.

Although the amount of excludable time that is warranted by a matter's complexity involves a case- and fact-specific inquiry, the case law makes clear that delays of between one and two and a half years in complex cases have been deemed reasonable, and have withstood challenges under both the Speedy Trial Act and the Sixth Amendment speedy trial guarantee. Speedy trial claims are especially difficult to sustain when lodged by long-term fugitives after having been found by the government and arrested. The Speedy Trial Act's provisions for excludable time apply equally to defendants who are subject to pretrial detention. When justified by the particular circumstances of the prosecution, substantial periods of pre-trial delay have been upheld in the face of due process challenges brought by detained defendants – especially where the defendant bears a substantial responsibility for the pre-trial delay. In this very case, the Court of Appeals previously upheld a delay involving detained defendants of 32 months until the anticipated conclusion of trial.

Although the government submits that the current prosecution of Avelino Gonzalez-Claudio falls within the high end of those matters that courts have deemed "unusual or complex" for purposes of the Speedy Trial Act, the government nonetheless proposes that the Court grant a period of 18 months of excludable time between the date of a ruling on this motion and a scheduled trial date, based on the unusual and complex nature of the case. This request is closer to the mid-range of pre-trial delays that were allowed in the decisions cited herein, and given the case's complexity and unusual posture, falls well within the allowable parameters of the Speedy Trial Act. For similar reasons, the defendant's pre-trial detention during the requested period would not contravene his Due Process rights.

If the Court is disinclined to make such a preliminary determination about the excludable time to be granted pending trial, the government suggests in the alternative that the Court grant 120 days of excludable time from the date of a ruling on this motion, with a scheduling conference to be held towards the end of the 120 day period.

<u>Pertinent Facts</u>

There are several facts pertinent to assessing the complexity of the indictment and anticipated trial in this matter. On or about March 21, 1986, defendant Avelino Gonzalez-Claudio and 18 other defendants were named in a 67-page, superseding indictment that charged a total of 17 felony counts of illegal conduct, all based upon certain events occurring before, during, and after the September 12, 1983, armed robbery of more than $7 million from a Wells-Fargo depot in West Hartford, Connecticut. The defendant was named in 15 of those 17 counts. The indictment alleges that the armed robbery was planned and perpetrated by the defendants in their capacity as members of a group known as the "Macheteros," which according to the superseding indictment, funded its operations

-5-

"through economic expropriations including robbery." After almost three years of pretrial litigation, five of the defendants proceeded to trial, which concluded on April 10, 1989, with four defendants being found guilty, and one defendant found not guilty. A subsequent trial, which concluded on May 5, 1992, found two more defendants guilty (one in absentia). As evidenced in those trials, the Macheteros, or "machete wielders," was a self-described revolutionary organization that sought independence for Puerto Rico, and that publicly claimed credit for the Connecticut Wells Fargo armed robbery. See United States v. Maldonado-Rivera, 922 F.2d 934, 944-946 (2d Cir. 1990). The trial narrative included not just the planning and execution of the armed robbery, but several actions by the co-conspirators during a year-and-a-half period after the robbery, which involved, among other things: the purchase of cars and motor homes; multiple cross-country trips using those vehicles for the purpose of moving the lead robber and batches of the stolen funds out of the continental United States to and through Mexico; the existence and involvement of the Macheteros in planning the robbery, the money transports, and other activities; communiques issued by the Macheteros to news organizations, claiming credit for the Wells Fargo robbery; and the planning and carrying out of certain toy giveaway programs in Hartford and Puerto Rico using robbery proceeds, in an apparent effort to garner community support for the Macheteros. Id. at 944-947. With respect to defendant Avelino Gonzalez-Claudio, it is the government's understanding that the evidence shows him to have been one of the leaders of the Macheteros before, during, and after the Wells Fargo armed robbery; that he served on the group's "Directive Committee," which planned and approved all operations of the Macheteros; that he directly participated in the second of the cross-country transports of robbery proceeds out of the continental United States; and that he subsequently retained control over a substantial share of the robbery proceeds.

-6-

There are also several facts pertinent to assessing the scope of investigative material from which the discovery and any trial evidence will need to be selected in preparing for pretrial proceedings and for trial. Between the 1983 armed robbery and the 1986 return of the superseding indictment, the FBI conducted an exhaustive investigation in the Commonwealth of Puerto Rico, in Connecticut, and in several other states and locations. Among other things, the evidence generated by the this investigation includes: many thousands of documents, most in Spanish, from more than 40 court-authorized search warrants; extensive telephone toll records; several hundred hours of court-authorized Title-III interceptions, most or all in Spanish, contained on obsolete reel-to-reel tapes; numerous episodes of visual surveillance in multiple states, which generated a large quantity of information, photographs, videotapes, and reports; and documents from such institutions as banks, car dealers, rental agencies, land records, motor vehicle departments, and United States and Mexican customs and border control.[1]  In preparation for the previous trials in this case, approximately 200 witnesses were identified and located.  Among the challenges of translating and assessing the significance of seized documents and Title III interceptions is the fact that the Macheteros members frequently communicated in code words, both for individuals' names, and in referring to the group's operations.

More recently obtained evidence shows that defendant Avelino Gonzalez-Claudio's 22 year status as a fugitive was knowing and willful, and that the FBI's inability to locate him during the several intervening years is not attributable to luck or accident. The defendant was one of the few individuals named in the superseding indictment who was never arrested nor presented in court at any time between the return of the superseding indictment and the conclusion of the previous trials. Over

---

[1]  Most or all of the Title III intercepts were translated into English at some point.  It is not presently known what portion of the seized documents were translated into English.

the intervening years, FBI agents continued to try to find and arrest the defendant. The defendant remained a fugitive until February of 2008, when he was located and arrested in Puerto Rico. At the time of his arrest, the defendant was living under a false identity, and was found to possess several false identification documents. Also found in a search of the defendant's residence following the arrest were documents that refer to the defendant's status as a fugitive in the above-captioned prosecution.[2]

Following the defendant's arrest, he was ordered transferred to Connecticut by the federal court in Puerto Rico. The defendant had his initial appearance in Connecticut on February 28, 2008, before Magistrate-Judge Thomas P. Smith. At that initial appearance, the government orally moved for pre-trial detention under 18 U.S.C. § 3142(e) and (f), on the basis that the case involves a crime of violence as defined in 18 U.S.C. § 3156, and that there is no condition or combination of conditions of release which will reasonably assure the defendant's appearance as required and the safety of any other person and the community. The Court preliminarily granted the government's motion on that day.[3]

---

[2] The only other permanent occupant of the defendant's residence was his wife, who insisted that she had no knowledge of the defendant's true identity, and hence by implication, was not the possessor of the documents identifying the defendant as a fugitive.

[3] The government's detention motion remains pending to this day, because as yet there has been neither a detention hearing (and hence no order based on such a hearing), nor a stipulation of the parties consenting to the defendant's continued detention. On February 28, 2008, after the United States lodged its oral motion for detention, the Court scheduled a detention hearing for Tuesday, March 4, 2008. Subsequently, upon defense counsel's request for more time to obtain certain materials from the District of Puerto Rico for purposes of the detention hearing, the March 4 hearing date was vacated. Soon thereafter, a motion for appointment of new defense counsel was filed, and litigation concerning pre-trial detention was held in abeyance pending a decision on the appointment of counsel motion. On March 25, 2008, the Court granted the motion to appoint new defense counsel, and since that time, the parties have commenced discussions to determine whether the pre-trial detention issue can be resolved short of an adversarial hearing.

Of singular importance to the case at present is the impact of the defendant's evading arrest for 22 years upon preparations for pretrial proceedings and for trial. Over the intervening years, the ordinary processes of time and attrition have resulted in the departure from the New Haven FBI, the San Juan FBI, and the Connecticut U.S. Attorney's office of virtually every agent and every federal prosecutor who worked on the Wells-Fargo/Macheteros investigation and trials.[4] There is literally no agent left at the New Haven and San Juan FBI, and no prosecutor left at the Connecticut U.S. Attorney's office, who has the familiarity with the facts, documents, and evidence akin to that of the original investigative and prosecutive team. In the 16 years since the conclusion of the second jury trial, all of the New Haven FBI's and Connecticut U.S. Attorney's Office's materials from the investigation and prosecution were boxed up and placed in storage. Currently the New Haven FBI has identified approximately 150 boxes of materials on the case in its possession (approximately 20 of which are believed to contain Title III audiotape reels), above and beyond the thousands of pages of FBI-302s and other investigative reports that were generated in the investigation. The Connecticut U.S. Attorney's Office has identified approximately 300 boxes of materials from the case that have been ordered from a remote storage facility.

In addition to the materials generated by the original case investigation, there exists a more recent layer of investigative materials that are being preliminarily reviewed and assessed for their relevance to a trial of the defendant. Principally these consist of the several documents and materials seized pursuant to the February 2008 search of the defendant's Puerto Rico residence. Regarding this

---

[4] There remains one agent at the San Juan FBI who performed some surveillance on Los Macheteros during the 1980s, but the agent had minimal, if any, involvement in the investigation of Los Macheteros with respect to the 1983 Wells-Fargo robbery, and the agent played no role in any of the preparations for the indictments and prior trials in this case. No agent remains at the New Haven FBI (which has investigative responsibility for the entire District of Connecticut) who participated in the original investigation and trial preparation.

search, agents of the San Juan FBI office have advised as follows:  among other items, numerous computer storage media were seized; and based on a very preliminary review, the San Juan FBI agents flagged more than 6,000 pages of documents – most or all in Spanish – for more extensive review, translation, and analysis by the New Haven FBI.  In addition, a further source of potentially relevant evidence consists of items seized approximately two years ago in Puerto Rico, from one or more searches that followed the attempted arrest of another fugitive defendant, Filiberto Ojeda-Rios.  An extensive collection of documents pertaining to the Macheteros was seized from Ojeda-Rios's residence at that time.  These present similar issues of translation, review, and assessment in relation to the pending charges against the defendant.

Governing Law

A.    The Speedy Trial Act and Complex Cases

The Speedy Trial Act, 18 U.S.C. § 3161, generally requires that the trial of a defendant charged by indictment "shall commence within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1) (parenthetical in original).  Recognizing that such a time line is not always practicable, the Act also provides that various "periods of delay shall be excluded" from the seventy-day clock.  18 U.S.C. § 3161(h). Zedner v. United States, 126 S. Ct. 1976, 1983 (2006).  For example, the statute excludes periods of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," § 3161(h)(1)(F), and "any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court," § 3161(h)(1)(J).

The Act also recognizes that district judges require the flexibility to accommodate unique case-specific concerns that do not fit neatly into any of the categories set forth in § 3161(h)(1)-(7). Under § 3161(h)(8), a district judge may grant a continuance *sua sponte* or at a party's request "on the basis of a finding that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The Act directs that a judge "shall consider" a non-exhaustive list of factors when determining whether to grant such a continuance. § 3161(h)(8)(B). Those factors include, among others, the following:

> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

§ 3161(h)(8)(B)(ii). As a procedural matter, a court is required by the Act to "set[] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." § 3161(h)(8)(A); see Zedner, 126 S. Ct. at 1989 n.7 (noting that "[t]he best practice . . . is for a district court to put its findings [supporting an ends-of-justice continuance] on the record at or near the time when it grants the continuance").

The Court of Appeals for the Second Circuit has approved the practice followed by some district courts of designating a criminal case, at or near the outset, as an unusual or complex matter within the meaning of § 3161(h)(8)(B)(ii). For example, in United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1198 (2d Cir. 1989), the Court of Appeals found that a district court had acted properly when, at the time of arraignment, it considered the various factors set forth in § 3161(h)(8)(B), it accepted the parties' representations about both the scope of the case and the

necessary time for motions practice, and it declared the prosecution a "'complex case' within the meaning of the [Speedy Trial] Act." 871 F.2d at 1197.

Once such a finding has been made, "it would perhaps generally be preferable for the court initially to set a tentative trial date, [though] it is not an abuse of discretion in a case . . . to postpone the setting of a date until the extent of the needed pretrial proceedings becomes clearer, so long as there is no intent or appearance that unlimited or undue delay will be permitted." Id. In Beech-Nut, the Court of Appeals affirmed the district court's decision, made at the time of arraignment and with the consent of all parties, to "postpone setting a trial date until pretrial proceedings were well underway." 871 F.2d at 1197. However, the Court of Appeals cautioned that continuances on the grounds of complexity may not be open-ended, and that "indefinite delay" is unacceptable. Id. "The length of an exclusion for complexity must be not only limited in time, but also reasonably related to the actual needs of the case." United States v. Gambino, 59 F.3d 353, 358 (2d Cir. 1995); see also United States v. LoFranco, 818 F.2d 276, 277 (2d Cir. 1987) (per curiam) ("the length of an exclusion under § 3161(h)(8) for a 'complex' case, 18 U.S.C. § 3161(h)(8)(B)(ii), should reasonably be related to the actual needs of the case, and should not be used either as a calendar control device or as a means of circumventing the requirements of the Speedy Trial Act").

Although the amount of excludable time that is warranted by a matter's complexity involves a case- and fact-specific inquiry, the case law makes clear that delays of between one and two and a half years in complex cases have been deemed reasonable, and have withstood challenges under both the Speedy Trial Act and the Sixth Amendment speedy trial guarantee. See, e.g., United States v. Kaufman, 354 F.Supp.2d 1201, 1208 (D. Kan. 2005) (designating matter as complex case and scheduling trial 14 months after return of superseding indictment, where "government describe[d] the

discovery to be made available to the defendants [to] include[] seventy-five boxes of materials and documents, two hundred videotapes, one hundred audiotapes, and other information yet to be recovered from computers and other equipment"); United States v. Burke, 673 F.Supp. 1574, 1576-1580 (N.D. Ga. 1986) (delay of 30 months between unsealing of indictment and scheduled start of complex narcotics conspiracy trial violated neither Speedy Trial Act nor Sixth Amendment speedy trial right); United States v. Prieto-Romero, 47 Fed.Appx. 432, 433-434, 2002 WL 1378884, 1 (9th Cir. June 24, 2002) (unpublished) (delay of more than one year in matter designated as complex case violated neither Speedy Trial Act nor Sixth Amendment speedy trial right); United States v. Hardimon, 2008 WL 141511, 3-5 (N.D. Ind. January 11, 2008) (unpublished) (11 month delay between return of indictment and start of trial was justified by, among other factors, complexity of case, and violated neither Speedy Trial Act nor Sixth Amendment speedy trial right); United States v. Banks, 2007 WL 1520109, 2 (D. Colo. May 21, 2007) (unpublished) (declining to schedule trial date and granting 15-month delay between indictment and scheduling conference, based on complexity of case involving multiple defendants, extensive wiretap evidence, and physical evidence seized in more than 40 search warrants). Cf. United States v. Casas, 425 F.3d 23, 31-36 (1st Cir. 2005) (41 month delay between indictment and trial did not violate Speedy Trial Act because of time excluded for pending motions, and did not violate Sixth Amendment Speedy Trial right because of, among other things, "the large and complex nature of the proceedings"). See also United States v. Paul, 326 F.Supp.2d 382, 391 (E.D.N.Y. 2004) (rejecting "contention that while this case may have been complex in 2001, it somehow lost its complexity by November of 2003"); Burke, 673 F.Supp. at 1578 ("The complexity of a case such as the present case is unlikely to lose its complexity on a specific date or at the happening of any specific event.").

-13-

B.     Excludable Time and Detained Defendants

The Speedy Trial Act's provisions for excludable time apply equally to defendants who are subject to pretrial detention. 18 U.S.C. § 3164(b). See also United States v. Leon, 614 F.Supp. 156, 156-157 (W.D.N.Y. 1985) (noting that detained defendants are subject to the Speedy Trial Act's computations of excludable time). When justified by the particular circumstances of the prosecution, substantial periods of pre-trial delay have been upheld with respect to detained defendants. The constraint upon the duration of pre-trial detention lies in the Fifth Amendment's Due Process Clause. United States v. Millan, 4 F.3d 1038, 1043 (2d Cir. 1993); United States v. Melendez-Carrion, 820 F.2d 56, 59 (2d Cir.1987). The Court of Appeals has articulated the Due Process inquiry under such circumstances as follows:

> . . . To determine whether the length of pretrial detention has become constitutionally excessive, we must weigh three factors: "(i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based," United States v. Orena, 986 F.2d 628, 630 (2d Cir.1993); that is, the evidence concerning risk of flight and danger to the safety of any other person or the community.

Millan, 4 F.3d at 1043; see also Melendez-Carrion, 820 F.2d at 59. In Millan, the Court of Appeals rejected a Due Process challenge to a pre-trial detention period of 30 months, noting that "[t]his court has upheld projected pretrial detention periods of up to thirty-two months." 4 F.3d at 1044. Significantly, the Millan Court reached this conclusion in spite of its finding that actions by the government were "the primary reason" for approximately one-third of the thirty months of pre-trial delay. Id. at 1044-1045. In approving such a lengthy period of pre-trial detention, the Court relied on the very strong evidence that the defendant presented both a risk of flight, and a danger to the community. Id. at 1045-1048.

-14-

In Melendez-Carrion – which concerned two co-defendants of Avelino Gonzalez-Claudio in the same Wells-Fargo robbery prosecution – the Court of Appeals reached a similar conclusion to that of Millan. The Court rejected a Due Process challenge to a detention period expected to last a total of 32 months (specifically, 24 months before the commencement of trial, and 32 months before the conclusion of trial). 820 F.2d at 60-62. The Court found that "the prosecution is not responsible for a significant portion of the delay in bringing appellants to trial," and that the risk of flight evidence was strong, insofar as "both appellants had a record of prior flight and did not have strong ties to the community," and "both appellants were charged as planners and organizers of the alleged conspiracy and robbery." Id. See also, e.g., United States v. Casas, 425 F.3d 23, 33-36 (1st Cir. 2005) (upholding 41 month pretrial delay involving detained defendant, citing complexity of case among reasons for delay); United States v. Davenport, 935 F.2d 1223, 1239-1240 (11th Cir. 1991) (upholding 21 month pre-trial delay involving detained defendant, based on complexity of the case).

C.    Speedy Trial Rights as Applied to Fugitives

In cases where a defendant's choice to remain a fugitive results in especially long delays between indictment and trial, the weight to be accorded a defendant's speedy trial claim is substantially diminished. "A defendant's claim that the government violated her right to a speedy trial is seriously undermined when the defendant, and not the government, is the cause of the delay." United States v. Blanco, 861 F.2d 773, 775-781 (2d Cir. 1988). In Blanco, the defendant and several others were indicted on narcotics trafficking charges in 1975. 861 F.2d at 775. Investigating agents first located the defendant in 1977, living in Columbia under a false identity. Id. The defendant told an informant that she was avoiding travel to the United States because she was "wanted" there. Id. Owing to the lack of, and the subsequent non-enforcement of, an extradition treaty on the part of the

Columbian government, several years elapsed without any opportunity to effect the defendant's arrest. Id. at 776. In 1984, however, the defendant was spotted in California, still living under a false identity. Id. The defendant was finally arrested in early 1985. Id. Thereafter, she claimed that her speedy trial rights had been violated. Id. at 780. Among other conclusions, the Court noted the following:

> . . . Despite her knowledge of the outstanding indictment, Blanco chose to become a fugitive . . . . . A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges. Blanco clearly made no effort to return to the United States to face charges. Further, her use of a false name and other evasive techniques while in California between September 1984 and February 1985 supports the government's contention that before she was arrested Blanco had no interest in a trial, speedy or otherwise.
>
> . . . Coming from a former fugitive, Blanco's claim that her right to a speedy trial was denied carries almost no weight.

Id. at 779-780 (citations omitted). The Court of Appeals further noted that the timing of a speedy trial claim is significant, and that a claim lodged only after a prolonged period of fugitivity warrants little, if any, consideration: "[s]ince the bulk of the delay of which [defendant] . . . complain[s] occurred between her indictment . . . and her arrest . . . , and she only asserted her claim after her arrest, this factor does not help her case." Id. at 780. See also, e.g., United States v. Sandoval, 990 F.2d 481, 482-483 (9th Cir. 1993) (rejecting speedy trial claim first lodged by fugitive after his arrest, more than 20 years after his failure to appear at arraignment)[5]; United States v. Mitchell, 957 F.2d 465, 468-470 (7th Cir. 1992) (rejecting speedy trial claim first lodged by fugitive after his arrest, which followed

---

[5] The Ninth Circuit Court of Appeals held in Sandoval that when the defendant's fugitivity is the cause of the post-indictment delay, then "he *waives* the right to a speedy trial." 990 F.2d at 483 (emphasis added). The Second Circuit Court of Appeals chose not to adopt a strict "waiver" approach to such claims, but noted, "although failure to assert the right does not act as a waiver, such failure will make it difficult for a [fugitive] defendant to assert his right successfully at some later point in time." Rayborn v. Scully, 858 F.2d 84, 92 (2d Cir. 1988).

defendant's fleeing a half-way house, moving to Columbia, and remaining several years there as a fugitive); Rayborn v. Scully, 858 F.2d 84, 89-94 (2d Cir. 1988) (rejecting speedy trial claim lodged by fugitive, despite finding prosecuting authorities responsible for 2 of the 7 years of delay, where defendant's bail-jumping and fugitivity accounted for 4 ½ years of delay, and defendant lodged speedy trial claim only towards end of 7 years); United States v. Love, 859 F.Supp. 725, 738 (S.D.N.Y. 1994) ("In light of the fact that [defendant] apparently was aware that he was wanted in connection with this Indictment, [defendant]'s failure to assert his right to a speedy trial weighs against his motion.").

In a similar vein, the Court of Appeals in Rayborn rejected the defendant's claim of prejudice based on the unavailability of two witnesses who allegedly could have testified in the defendant's favor, quoting the trial judge's admonition that, "'it ill behooves [the defendant] to attempt to charge the State [now] with responsibility for the absence of . . . witnesses who became unavailable during the time he was a fugitive.'" (ellipses in original)  858 F.2d at 94.

### Discussion

The instant matter warrants designation as an unusual and complex case, because the scope and nature of the prosecution, and the existence of novel questions of fact or law that it presents, preclude "adequate preparation for pretrial proceedings or for the trial itself within the time limits established by" the Speedy Trial Act.

As noted above, the evidentiary narrative consists of the activity of 19 co-conspirators over a period of year and a half, which includes among other things:  the planning and execution of an armed robbery of more than $7 million; the purchases of cars and motor homes; multiple cross-country trips using those vehicles to move the lead robber and batches of the stolen funds out of the

continental United States; the existence and involvement of the Macheteros in planning the robbery, the money transports, and other activities; communiques issued by the Macheteros to news organizations, claiming credit for the Wells Fargo robbery; and the planning and carrying out of toy giveaway programs in Hartford and Puerto Rico using robbery proceeds. As also noted above, the evidentiary sources of this extended narrative were drawn from a virtual mountain of materials, including: many thousands of documents, most in Spanish, from more than 40 court-authorized search warrants; extensive telephone toll records; several hundred hours of court-authorized Title-III interceptions; extensive visual surveillance that generated a large quantity of information, photographs, videotapes, and reports; documents from, among other sources, banks, car dealers, rental agencies, land records, motor vehicle departments, and United States and Mexican customs and border control; and approximately 200 witnesses identified and located for previous trials. In addition, the defendant's willful fugitivity for so many years has generated – and made necessary – new sources of evidence to assess and present at a jury trial, both to explain the long hiatus between the crimes and the trial, and as further evidence of guilt. These materials include thousands of pages of hard copy and/or electronically stored documents seized at the defendant's residence in February 2007, and numerous documents seized from searches following the attempted arrest of a co-defendant in 2006. Although most or all of the Title III intercepts were translated into English for the previous trials, it appears that many of the original Spanish-language documents have not been translated; and there remain thousands of pages of recently-seized documents that will need to be translated and assessed. Adding to the challenges of document translation is the fact that the Macheteros members frequently communicated in code words, both for individuals' names, and in referring to the group's operations.

Although only one defendant would be on trial, establishing his guilt on the 15 counts with which he is charged will require a substantial share of the evidence introduced at the previous trials, as well as evidence not previously prepared for trial that focuses specifically on the role played by Avelino Gonzalez-Claudio in the Macheteros and its activities. In some respects, preparing this case for pre-trial proceedings and for trial at the present time will be significantly more difficult than it would have been if the defendant's trial had commenced around the times of the prior trials, between 1989 and 1992. The consequences of the many years of delay – all attributable to the defendant's knowing and willful fugitivity – include, among other things: the attrition from the New Haven and San Juan FBI and from the Connecticut U.S. Attorney's office of *all* the agents and prosecutors who had extensive, hands-on familiarity with the unusually large quantity of evidence, the numerous witnesses, and the several legal issues pertinent to the prosecution of the case; the consequent need for the newly-assigned FBI agents and assistant U.S. attorneys to re-create, from a point of virtually zero knowledge, the necessary familiarity with all those matters (noting that the original investigative/prosecutive team had more than five years from the time of the armed robbery until the first jury trial, and almost three years from the date of the superseding indictment until trial); the likelihood that many significant witnesses will be either deceased, difficult or impossible to locate, or if found, lacking sufficient recall of the matters of which they once had knowledge; and the consequent need by the new investigative/prosecutive team to determine whether, and how, such evidentiary gaps can be filled for the present trial.

By way of example, in the approximately six weeks since the defendant's initial presentment before Magistrate-Judge Smith, the FBI and the U.S. Attorney's office have spent extensive time simply attempting to obtain, organize, and identify the hundreds of boxes of case materials that had

been held in storage; becoming familiar with the basic facts of the case that were developed between

1983 and 1985; identifying and forwarding to the FBI's headquarters in Virginia, the original,

working reel-to-reel copies of the Title III intercepts, to be converted to digital format for purposes

of both pre-trial discovery and eventual trial presentation; starting the processes of cataloguing the

approximately 200 witnesses identified in trial preparation almost 20 years ago (including former

agents who worked on the case); attempting to determine those witnesses' current locations and

contact information; and making arrangements to contract with Spanish-English translators, without

whom a large share of document review and assessment cannot even commence.

In sum, the government submits that the present case falls within the high end of those matters

that courts have deemed "unusual or complex" for purposes of the Speedy Trial Act. The government

nonetheless proposes, at present, that the Court grant a period of 18 months of excludable time

between the date of a ruling on this motion and a scheduled trial date, based on the unusual and

complex nature of the case – which is closer to the mid-range of pre-trial delays that were allowed

in the decisions cited above.[6] Among those decisions are a previous ruling in this very case, involving

---

[6] As calculated by the government, no time has elapsed on the speedy trial clock yet, because it has been tolled from the first day that the clock would have started running. Specifically, the speedy trial clock would have commenced running upon the defendant's initial appearance before Magistrate-Judge Smith on February 28, 2008, since that is the date of the defendant's first appearance "before a judicial officer of the court in which such charge is pending . . . ." 18 U.S.C. § 3161(c)(1). See also United States v. Montoya 827 F.2d 143, 152 (7th Cir. 1987); United States v. Robinette, 177 F.Supp.2d 279, 285 (D.Del. 2001) ("Where the indictment is issued before arrest, . . . the first appearance before a judicial officer in the court where the indictment has been filed is the event that triggers a defendant's speedy trial rights.").

On that same day, the United States orally lodged its motion for pre-trial detention, which motion remains pending to this day. See n.3, above. The lodging and continued pendency of that motion has tolled the speedy trial clock since February 28, 2008. See 18 U.S.C. § 3161(h)(1)(F) (time excludable under speedy trial clock includes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to— . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other

two co-defendants of Avelino Gonzalez-Claudio, in which the Court of Appeals approved a delay of 32 months before the conclusion of trial, and rejected Due Process challenges based on the defendants' remaining in detention throughout that period. United States v. Melendez-Carrion 820 F.2d 56 (2d Cir.1987). As is equally true in the current proceedings, the Court of Appeals found with respect to those two co-defendants that "the prosecution is not responsible for a significant portion of the delay in bringing [the defendants] to trial," that the defendants "had a record of prior flight and did not have strong ties to the community," and that the defendants "were charged as planners and organizers of the alleged conspiracy and robbery." Id. at 60-62. Even if Melendez-Carrion were not deemed to bind this tribunal under the law of the case doctrine, the reasoning of the Court of Appeals in that decision certainly furnishes guidance to the effect that, under the circumstances of the present case, an 18 month excludable period would fall well within the acceptable parameters of the Speedy Trial Act, and that the defendant's pre-trial detention during such period would not contravene his Due Process rights.

In the event the Court were disinclined to make such a preliminary determination about the excludable time to be granted pending trial, the government would suggest in the alternative that the Court grant 120 days of excludable time from the date of a ruling on this motion, with a scheduling conference to be held towards the end of that 120 day period.

---

prompt disposition of, such motion . . . ."); United States v. Nixon, 779 F.2d 126, 130 -131 (2d Cir. 1985) ("Oral pretrial motions made on the record are considered motions for purposes of § 3161(h)(1)(F)."). In addition, 14 days of that period are also excludable because of the time that elapsed between the March 11, 2008, filing of the defendant's motion for appointment of counsel, and the March 25, 2008, decision granting that motion.

<u>Conclusion</u>

WHEREFORE, the United States respectfully requests that the Court grant this motion, that the Court designate this matter an unusual and complex case warranting excludable time under the Speedy Trial Act, and that the Court grant an 18 month period of excludable time from the date of a decision on this motion until a scheduled trial date.

Respectfully submitted

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

HENRY K. KOPEL
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. ct24829
157 Church Street, 23d Floor
New Haven, CT  06510
(203) 821-3700

PAUL MCCONNELL
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. phv02501
450 Main Street
Hartford, CT  06103
(860) 947-1101

## CERTIFICATE OF SERVICE

I HEREBY certify that I caused a copy of the foregoing to be sent by first-class mail, postage prepaid, and by e-mail (.pdf format), this *10th* day of April, 2008, to James W. Bergenn, Esq., Morgan P. Rueckert, Esq., and Moira L. Buckley, Esq., all at Shipman & Goodwin, One Constitution Plaza, Hartford, CT 06103-1919, and each having the respective e-mail address of jbergenn@goodwin.com, mrueckert@goodwin.com, and mbuckley@goodwin.com.

Assistant U.S. Attorney

-23-